**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert CASTILLO, Jr.,
Defendant-Appellant.**

No. 78–3551.

United States Court of Appeals,
Ninth Circuit.

March 26, 1980.

Rehearing Denied May 5, 1980.

J. Stephen Czuleger, Beverly Hills, Cal. (argued), for defendant-appellant; Terry W. Bird, Vincent J. Marella, Beverly Hills, Cal., on brief.

Fredrick M. Flam, U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS, Senior Circuit Judge, ANDERSON, Circuit Judge, and PALMIERI,* Senior District Judge.

J. BLAINE ANDERSON, Circuit Judge:

Castillo appeals his conviction following a jury trial of one count of manslaughter in violation of 18 U.S.C. § 1112, and of one count of conveyance of a dangerous instrumentality within a federal correctional institution in violation of 18 U.S.C. § 1792. We affirm the judgment of conviction.

I. *BACKGROUND*

We view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

In September 1977, Castillo was involved in an altercation while incarcerated at a federal correctional institution. Inmate Michael Flores was stabbed during the incident and died a short time later as a result of stab wounds.

The events leading to Flores' death apparently were set in motion on the evening before the stabbing, September 10. Castillo was visiting inmate Sleepy Munoz at Munoz' cubicle, along with another inmate,

* The Honorable Edmund L. Palmieri, Senior United States District Judge for the Southern District of New York, sitting by designation.

Manuel Spiteri. Flores entered the cubicle, and asked Munoz to step outside. Once outside the cubicle, Flores and Munoz began to fight. Castillo and Spiteri stopped the fight, and Flores eventually departed after an exchange of apologies. Flores apparently remained unsatisfied, however, because he entered Munoz' cubicle later that night while Munoz slept and hit Munoz on the head several times with a pipe, inflicting painful damage.

News of the piping of Munoz increased tension considerably at the institution on the morning of September 11. Flores and a number of his friends began discussing the possibility of an armed confrontation with Castillo, Spiteri and their group of friends. Castillo spent the morning getting a tattoo in another inmate's cubicle with several of his friends present. By way of an intermediary, Flores informed Castillo that he wanted to fight. Castillo also received reports from other inmates that Flores and his group had gathered in the prison yard and were all wearing jackets·despite warm temperatures, an indication that the group might be carrying concealed weapons.

According to Castillo, he gave a knife which had been offered to him by another inmate to his friend, "Buzz" Miller. As Castillo and Miller returned to their own unit, they were confronted by Flores and his group in a hallway. Other members of Castillo's group were also present. At this point, under Castillo's version, Miller handed him the knife.

A member of Flores' group approached Castillo and said that Flores wanted to fight. Castillo replied that he did not want to fight, and assumed a squatting position when Flores approached. After a brief discussion with Castillo, Flores returned to his group, conferred with a friend, and then came back over to Castillo and kicked him in the head. According to the government's evidence, another inmate grabbed Flores from behind and restrained him as Castillo proceeded to inflict at least three stab wounds. The scuffle lasted only a few seconds, and Castillo dropped the knife he had used to stab Flores almost immediately.

Other evidence critical to specific claims of error will be developed in subsequent sections.

## II. ISSUES ON APPEAL

Castillo has raised seven claims of error:

(1) Whether the deportation of two inmates who might have witnessed the stabbing violated Castillo's right to compulsory process;

(2) Whether hearsay statements admitted into evidence unfairly prejudiced Castillo;

(3) Whether the prosecution's comment on the invocation of the privilege against self-incrimination by two defense witnesses was improper and prejudicial;

(4) Whether evidence of an alleged attempt to suppress evidence by Castillo was improperly admitted;

(5) Whether a statement made by Castillo to a correctional officer was in the course of a plea bargain and improperly admitted against him;

(6) Whether the probative value of certain physical evidence admitted against Castillo was outweighed by its potentially prejudicial effect;

(7) Whether evidence was sufficient to convict Castillo on each count.

## III. DEPORTATION OF WITNESSES

Castillo claims that his right to compulsory process was violated when the government deported two alien inmates who were present at the stabbing of Flores, and who probably witnessed the incident. Castillo relies upon United States v. Mendez-Rodriguez, 450 F.2d 1 (9th Cir. 1971), and subsequent cases.

According to testimony adduced at trial, one of the aliens, Francisco Ramos, was standing close by the spot where Flores fell after being stabbed, and assisted in carrying Flores to the hospital. Testimony also placed the other alien Jesus Gonzales, nearby in the hallway at the time that the altercation took place.

■ *Mendez-Rodriguez, supra,* established as the law of this circuit the proposition that the unilateral act of deporting aliens who are potential witnesses to a criminal act may deprive a defendant of rights guaranteed under the due process clause of the fifth amendment and the compulsory process clause of the sixth amendment. In *Mendez-Rodriguez,* a conviction for conspiracy to smuggle illegal aliens and for separate counts of transporting aliens was reversed where the government had deported three of the six aliens apprehended shortly after the defendant was arrested.

■ The gist of a *Mendez-Rodriguez* violation lies in the interference with the opportunity to formulate a defense. Conduct by the government which prevents a defendant from interviewing potential witnesses and making an independent judgment on which witnesses should be called deprives a defendant of the fundamental right to plan and present a defense to criminal charges. *See United States v. Tsutagawa,* 500 F.2d 420, 423 (9th Cir. 1974). The deportation of alien witnesses places the witnesses beyond the reach of compulsory process and unfairly interferes with preparation of a defense.

■ We cannot say that deportation in this case prevented counsel for Castillo from interviewing and selecting defense witnesses. Flores was stabbed on September 11, 1977. Ramos was transferred from the institution on October 22, and deported on October 26. Gonzales was transferred on February 21, and deported on March 6. *Mendez-Rodriguez* does not require that the government search out and produce witnesses whose testimony may be favorable to the defense. *See* 450 F.2d at 5. On two previous occasions, panels of this circuit have upheld convictions where the allegedly improper deportations did not occur until after the defense had been afforded a reasonable amount of time to interview the witnesses. In *United States v. Romero,* 469 F.2d 1078 (9th Cir. 1972) (per curiam), *cert. denied,* 410 U.S. 985, 93 S.Ct. 1512, 36 L.Ed.2d 182 (1973), the panel found that the

defendant had received an adequate opportunity to conduct witness interviews with aliens who were available up until the time that the defendant was indicted. In *United States v. Lomeli-Garnica,* 495 F.2d 313 (9th Cir. 1976), a potential witness was allowed to return to Mexico only six days after the defendant's arrest for possession of marijuana, and the panel there found that sufficient time to interview had been given the defendant.

The government's obligation to retain a deportable alien who may be a material witness is not easily defined in terms of its time element. While the government must insure that the defendant will have a reasonable opportunity to interview alien witnesses and determine their possible value to the preservation of an effective defense, it need not retain indefinitely every alien who may have some remote connection with alleged criminal activity. In the present case, both Ramos and Gonzales denied witnessing the stabbing in separate interviews with federal agents. Though the government apparently was in possession of other information tending to place both of the aliens at the scene of the stabbing, its judgment that the aliens would not have contributed significantly to trial preparation was not unreasonable and it apparently acted in good faith. Ramos was available for interviews until over one month after the incident, while Gonzales was available for approximately five months. While we are mindful of the realities of modern trial investigation, we do not find that the government "prevented" Castillo from gaining access to these two witnesses within the terms of *Mendez-Rodriguez.*

## IV. HEARSAY

■ During the trial, prosecution witness Rand Neely was allowed to testify, over objection, to statements allegedly made by two of Castillo's confederates. In the first instance, Neely testified that shortly before Flores was stabbed he spoke with an inmate named Peterson, a friend of Castillo. When asked by Neely what was happening, Peterson allegedly replied that "[w]e are fixing

to kill a Mexican." The court allowed the testimony in for the purpose of showing an agreement among the members of Castillo's faction, after receiving assurances from the government's attorney that sufficient evidence of a conspiracy would later be introduced. Neely also testified that he was threatened by an inmate named Jimmy Ortega, after being transferred to another institution, that if he testified against Castillo there would be "no place [he] could go or hide."

It was error to admit the Peterson statement. Hearsay statements are admissible under the co-conspirator exception, F.R.E. 801(d)(2)(E) only if made "in furtherance of the conspiracy." There is nothing in the record to indicate that Peterson somehow intended to further a conspiracy to kill Flores by announcing its object to Neely. At most, Peterson made nothing more than a casual admission to someone he had decided to trust. *See, e. g., United States v. Eubanks*, 591 F.2d 513, 520 (9th Cir. 1979); *United States v. Moore*, 522 F.2d 1068, 1077 (9th Cir. 1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976).

■ Our finding that error was committed does not, however, end our inquiry. We must determine whether the effect of that error was so prejudicial as to require reversal. We are confronted initially with the question of what standard of review applies. Because introduction of inadmissible hearsay arguably violates the confrontation clause, *cf. Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), we possibly must apply the "beyond a reasonable doubt" standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), to any determination of harmless error.

The erroneous introduction of inadmissible hearsay against a criminal defendant does not, however, automatically assume constitutional proportions. In *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), a plurality of the Supreme Court established a four factor test for determining whether admission of hearsay amounts to a constitutional violation, a test which has subsequently been adopted by this circuit. *E. g., United States v. Snow*, 521 F.2d 730 (9th Cir.), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976). As stated by the panel in *Snow, supra*, the *Dutton* test looks to the following indicia of reliability: (1) whether the declaration contains an assertion of a past fact, (2) whether the declarant had personal knowledge of the identity and role of the participants in the crime; (3) the possibility that the declarant is relying upon faulty recollection; (4) whether, under the circumstances, there is reason to believe that the declarant misrepresented the defendant's involvement. 521 F.2d at 734. *See also United States v. Eaglin*, 571 F.2d 1069 (9th Cir. 1977), *cert. denied*, 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978); *United States v. Wood*, 550 F.2d 435 (9th Cir. 1976); *United States v. Cruz*, 536 F.2d 1264 (9th Cir. 1976).

We find, under the *Dutton* test, that the error here was not of a constitutional dimension. Peterson was stating his present intent to kill a Mexican and was not relating a past fact whose recollection was possibly clouded by a faulty recollection. The jury had a sufficient indication of reliability to convince us that no constitutional violation occurred.

■ Because the introduction of Peterson's statement amounted only to violation of an evidentiary rule, we consider its prejudicial impact under the standard of F.R. Crim.Pr. 52(a). We reverse only if the error affected "substantial rights." Accordingly, we may affirm if, after consideration of the record, we find that the introduction of Peterson's statement was more probably than not harmless. *United States v. Valle-Valdez*, 554 F.2d 911, 916 (9th Cir. 1977); *see also United States v. Awkard*, 597 F.2d 667, 671 (9th Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); *United States v. Lyman*, 592 F.2d 496, 499 (9th Cir. 1978), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2864, 61 L.Ed.2d 300 (1979); *United States v. Indian Boy X*, 565 F.2d 585, 592 (9th Cir. 1977), *cert. denied*, 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978); *United States v. Dixon*, 562 F.2d 1138, 1143 (9th

Cir. 1977), *cert. denied*, 435 U.S. 927, 98 S.Ct. 1494, 55 L.Ed.2d 521 (1978).

Peterson's statement was probably harmless to Castillo's case. Castillo was indicted for first-degree murder under 18 U.S.C. § 1111, but was found guilty of voluntary manslaughter. Peterson's statement, in the mind of the jury, would have most likely gone to the issue of premeditation. By its verdict, the jury rejected the government's contention that the killing of Flores was premeditated. In addition, the evidence that Castillo voluntarily knifed Flores was substantial. Any prejudicial impact of the introduction of Peterson's statement was minimal, if not nonexistent. The admission of the statement was not, therefore, reversible error.

■ Much of the foregoing discussion applies also to the admission of the alleged threat by inmate Ortega. We assume, without deciding, that its admission was error. In light of the jury's ultimate verdict and the substantial evidence in its favor, we must conclude that any error here also was more probably than not harmless.

## V. COMMENT ON SELF–INCRIMINATION PRIVILEGE

■ During cross-examination of two separate defense witnesses, the government asked questions which elicited responses invoking the privilege against self-incrimination. Inmate James Ortega refused to answer when asked whether he was armed at the scene of the stabbing. Another witness, Coy Rightnour, refused four times to answer questions whether he had swept up from the floor of the hallway knives which had been dropped after the altercation was over. In each instance, counsel for the government commented on the invocation of the privilege during closing argument and asked the jury to infer that Ortega and Rightnour had been part of the preconceived plan to kill Flores.

The prosecution's comments in each instance were improper. A refusal to answer based upon the fifth amendment is not a permissible basis for inferring how the witness would have answered, absent the privi-

lege. *See, e. g., Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963); *United States v. Maloney,* 262 F.2d 535 (2d Cir. 1959). This argument was impermissible. Defense counsel, however, did not request that a curative instruction be given. The court gave no such instruction on its motion. *Namet v. United States,* 373 U.S. 179, 190, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963).

■ A criminal defendant has no standing to claim that a witness' attempt to exercise the privilege has been undermined. *United States v. Ceniceros,* 427 F.2d 685 (9th Cir. 1970); *cf. Bowman v. United States,* 350 F.2d 913 (9th Cir. 1965), *cert. denied,* 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212 (1966). The possibility of an adverse inference being drawn is, however, aggravated where the prosecution suggests that the jury find a witness' invocation of the Fifth Amendment to be the equivalent of an affirmative answer to a potentially incriminating question. The defendant is entitled to claim error on that basis. *United States v. Maloney, supra.* The error as to the defendant is not of a constitutional dimension.

■ Since no objection was entered, we must determine whether the court's failure to give a curative instruction was "plain error" under Fed.R.Crim.Pr. 52(b). The question of plain error goes to the reviewability of the alleged error, and not to its reversibility. An error may be "plain" enough to merit review, yet be so harmless as to preclude reversal. *United States v. Lopez,* 575 F.2d 681 (9th Cir. 1978). We find the error plain enough to merit our consideration. The prosecutor's comments clearly impinged upon the witness' exercise of the privilege, and arguably prejudiced the defendant's case at the time that they were uttered.

The failure to give a curative instruction, however, was harmless. The inferences sought each went to the question of premeditation and conspiracy. As noted earlier, the jury failed to accept the government's theory of premeditation when it convicted the defendant of manslaughter. The

matters involved in the questioning were strictly collateral to the issue of Castillo's guilt, of which there was substantial independent evidence. The prosecution's conduct and the court's failure to instruct the jury on the privilege did not constitute reversible error.

## VI. ATTEMPT TO SUPPRESS EVIDENCE

Castillo claims prejudicial error in the admission of testimony regarding a fight involving himself and inmate Michael Silvers several months after the stabbing of Flores while both were incarcerated at the Los Angeles County Jail. According to Silvers' testimony, he was attacked by Castillo with a sharp object while another inmate held him from behind. Silvers had been incarcerated at the federal institution with Castillo at the time of the Flores stabbing and had given a statement to the FBI regarding comments made by Castillo after the incident. The trial court allowed Silvers' testimony as evidence of an attempt by Castillo to suppress evidence, and, therefore, of consciousness of guilt.

■ An attempt by a criminal defendant to suppress evidence is probative of consciousness of guilt and admissible on that basis. *United States v. Brashier*, 548 F.2d 1315 (9th Cir. 1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977). Castillo argues that no foundation was laid for the admission of Silvers' testimony. Castillo points to uncontroverted evidence that he was under the impression that Silvers would not be called to testify, and also that the substance of Silvers' statement to the FBI supported Castillo's version of the incident. We have, on the other hand, testimony which placed a copy of Silvers' statement to the FBI in Castillo possession at the time of the fight.

■ Silvers testified, in substance, that Castillo attacked him unprovoked while both were in a crowd of inmates, and that another inmate held him from behind. No threats of any kind were made by either party. Were it not for Castillo's possession of the FBI report at the time of the fight, we would be inclined to agree that no foundation had been laid. It is a reasonable inference, however, that Castillo attacked Silvers because of his cooperation with the FBI and that he was seeking to discourage further cooperation. The trial court did not improperly exercise its discretion in admitting Silvers' testimony to demonstrate Castillo's consciousness of guilt.

## VII. PLEA BARGAINING

■ The court admitted evidence that Castillo had, in the course of a discussion with a prison counselor after Flores' death, indicated that he would probably "cop" to a charge of manslaughter. Castillo contends that the conversation with the counselor was in the course of plea bargaining and therefore inadmissible under Fed.R. Crim.Pr. 11(e)(6) and F.R.E. 408 and 410.

The conversation with the counselor arose in the course of a visit which the counselor made to Castillo while Castillo was incarcerated in the institution's isolation unit as a result of the Flores stabbing. Castillo had earlier been discussing with counsel the possibility of a plea negotiation. Castillo showed the counselor a typewritten list of potential charges, pointed to the federal manslaughter statute, and said he would probably "cop" to that charge.

This circuit has adopted a two-tiered test for determining whether an admission by a criminal defendant is made in the course of plea negotiations. The defendant must exhibit an actual subjective intent to negotiate a plea at the time of the discussion and the expectation of negotiating a plea at that time must be reasonable, given the totality of the circumstances. *United States v. Pantohan*, 602 F.2d 855, 857 (9th Cir. 1979). Castillo's discussion with the counselor meets neither prong of the *Pantohan* analysis. Castillo exhibited no intent to negotiate with the counselor. He merely related voluntarily his expectation on the probable outcome of plea negotiations. Objectively, even if he had harbored a subjective intent to negotiate with the counselor, any expectation at that time would have been unreasonable because the counselor was not empowered to negotiate on behalf of the government. Admission of the counselor's testimony was not error.

## VIII. PHYSICAL EVIDENCE

Castillo claims that unfair prejudice arose from the admission of photographs of Flores' body which showed close up views of the victim's wounds, and also from the admission of the clothing which Flores was wearing when he was stabbed. Castillo argues that the inflammatory nature of this evidence outweighed its probative value.

 The trial court is afforded a broad discretion in determining the admissibility of evidence, and a ruling on evidence will be overturned only for abuse of discretion. E. g., United States v. Ives, 609 F.2d 930, 933 (9th Cir. 1979); United States v. Martin, 599 F.2d 880 (9th Cir. 1979); United States v. Kearney, 560 F.2d 1358 (9th Cir.), cert. denied, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977). The evidence in question clearly had probative value. The number, location, and nature of the wounds were relevant factors in countering Castillo's claim of self-defense. No clearer evidence could be produced than direct evidence of the wounds themselves. Under the circumstances, we cannot say that the trial court abused its discretion in admitting the photographs and clothing.

## IX. SUFFICIENCY OF THE EVIDENCE

Castillo lastly argues that the evidence was insufficient to convict him of either manslaughter or conveyance of a dangerous instrumentality. Again, we view the evidence in the light most favorable to the government.

 Evidence of manslaughter was clearly sufficient. Testimony that Flores was held by another inmate while Castillo stabbed him repeatedly tended strongly to negate Castillo's claim of self-defense. The jury apparently chose to resolve conflicts between the testimony of prosecution and defense witnesses in favor of the government. That is not the sort of judgment we can second-guess on appeal.

 Evidence was also sufficient to convict on the conveyance charge. The conveyance element of 18 U.S.C. § 1792 is not substantial. The conveyance of an instrumentality only a few feet across a single room is sufficient to support a conviction. See, e. g., United States v. Tanner, 571 F.2d 334 (5th Cir.), cert. denied, 439 U.S. 845, 99 S.Ct. 142, 58 L.Ed.2d 145 (1978). Proof of possession alone may suffice where the circumstances of possession permit the inference of an earlier conveying of the instrumentality from one place to another. United States v. Hudges, 458 F.2d 188 (10th Cir. 1972).

 Castillo's version of the events placed the knife on the person of "Buzz" Miller at the time of conveyance. If the jury found this version not credible, the circumstances of possession raised a strong inference of conveyance. The knife was presented to Castillo earlier in the cubicle. He had been given reason to fear for his life and to arm himself prior to entering the hallway where the fight occurred. Under our standard of review, the jury had sufficient evidence before it to convict on the conveyance charge.

## X. CONCLUSION

The conviction of appellant Castillo is AFFIRMED.