Ronald **WILLIAMSON**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. 6950.

Court of Appeals of Alaska.

Dec. 21, 1984.

Mitchell J. Schapira, Anchorage, for appellant.

David Mannheimer, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Ronald Williamson was charged by indictment with one count of murder in the second degree, one count of robbery in the first degree and two counts of tampering with physical evidence. AS 11.41.110(a)(1); AS 11.41.500(a)(1); AS 11.56.610(a)(1), (a)(4). Following a jury trial, Williamson was convicted of manslaughter, a lesser-included offense of second-degree murder. He was also convicted of both counts of tampering with physical evidence. Superior Court Judge J. Justin Ripley sentenced Williamson to five years' imprisonment for each of the tampering charges and fifteen years' imprisonment for manslaughter. Williamson appeals, contending that the trial court erred in admitting the hearsay statement of his codefendant, Otis Orth, which was offered to prove that Williamson intended to rob the decedent, John Dunkin. In addition, Williamson argues that the court erred in excluding evidence which supported his claim that he was acting in self-defense, including evidence of Dunkin's sexually aggressive behavior on a prior occasion and physical evidence that Dunkin had access to drugs. Because we cannot find that admission of Orth's hearsay statement was harmless beyond a reasonable doubt, we reverse Williamson's conviction for manslaughter and remand for a new trial.

## FACTS

On the night of October 31, 1981, Ronald Williamson shot and killed John Dunkin. The facts surrounding the shooting were disputed at Williamson's trial. The state alleged that Williamson was attempting to

rob the decedent and that Williamson killed Dunkin when he resisted. The defense proceeded on the theory that Williamson was defending himself against a homosexual rape.

The state presented evidence that Williamson went out on Halloween night of 1981 with his friend, Otis Orth. They eventually arrived at the Hallea Lodge in Wasilla, where they met John Dunkin. According to the state's theory, Williamson saw that Dunkin was friendly and apparently a man of means; when Dunkin invited Williamson to go barhopping, Williamson decided to rob Dunkin and accepted the invitation.

According to the state, Dunkin and Williamson left the Hallea Lodge in Dunkin's car and went for a drive. Williamson eventually convinced Dunkin to stop the car and attempted to rob him. When Dunkin resisted, Williamson shot him. Williamson then put Dunkin's body in the trunk and drove back into town to find Orth. Orth and Williamson then drove to a remote area and mutilated the body almost beyond recognition. They also hid Dunkin's car and his valuables in separate locations.

The defense presented a different account of the events. Williamson testified that he and Orth went out on Halloween night but that neither one of them was carrying a weapon. At the Lodge, Dunkin approached Williamson and began buying him drinks. According to Williamson, Dunkin engaged him in conversation for a while and then asked Williamson and Orth if they wanted to "do some Quaaludes." Williamson and Orth agreed, and the three of them went outside to Dunkin's car. Before they could drive away, however, the bartender came outside and indicated to Orth that he did not think it was a good idea for Orth and Williamson to leave with Dunkin. The three then returned to the bar.

Later in the evening, according to the defense, Dunkin again offered Williamson some Quaaludes. This time Williamson left the bar alone with Dunkin and went for a ride in Dunkin's car. Williamson testified that Dunkin gave him two or three Quaaludes while they were driving around. At one point Williamson dropped his cigarette lighter. When he reached under the passenger seat to retrieve·it, he felt a gun.

Williamson testified that he and Dunkin eventually reached a remote area where Dunkin stopped the car. Dunkin then asked Williamson what his sexual preference was. Williamson noticed that Dunkin's pants were open and his penis was exposed. According to Williamson, Dunkin grabbed him and attempted to force him to perform fellatio. During the ensuing struggle, Dunkin forced Williamson onto his stomach and attempted to remove Williamson's pants. Williamson reached under the passenger seat, grabbed the gun he had discovered earlier, and shot Dunkin once in the chest.

Williamson admitted that he and Orth later attempted to destroy Dunkin's body.

■ Approximately one week later, Williamson voluntarily appeared at the Anchorage police station to turn himself in. He confessed and led investigators to Dunkin's body. Williamson's confession was largely consistent with his testimony at trial.[1]

---

1. Williamson argues on appeal that his confession was involuntary and that it should have been suppressed. Evidence presented at the pretrial suppression hearing revealed that Williamson voluntarily appeared at the police station. He told the desk sergeant that he wanted to turn himself in and that he thought he "might need an attorney." Sergeant Cargill had no idea what Williamson was talking about and questioned him for a few minutes until Williamson revealed that he knew where John Dunkin was and that Dunkin was dead. Cargill then advised Williamson of his *Miranda* rights and obtained a written waiver.

We reject Williamson's contention that his initial reference to an attorney vitiated his subsequent waivers of his *Miranda* rights. At most, it was an equivocal request made before Williamson was taken into custody as a suspect. *See Nash v. Estelle,* 597 F.2d 513 (5th Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979); *People v. Krueger,* 412 N.E.2d 537 (Ill.1980), *cert. denied,* 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 390 (1981). In context, Wil-

## HEARSAY

The state's last witness, Patricia Lynn Boyles, testified that she was present at Huppies Roadhouse in Wasilla on Halloween night of 1981. She saw Orth there at about 1:30 a.m. According to Boyles, when Orth was asked where his friend Williamson was, Orth replied, "He went out to roll a queer [who] had a lot of money."

Williamson objected to Boyles' testimony on hearsay grounds but the trial court admitted it under the co-conspirator's exception to the hearsay rule. Alaska Rule of Evidence 801(d)(2)(E).[2] Williamson contends on appeal that admission of the statement allegedly made by Orth was reversible error. He argues that the statement was not made in furtherance of any conspiracy.

The state concedes error, noting that the Alaska Supreme Court has recently reaffirmed the vitality of the "in furtherance of" requirement. See Crump v. State, 625 P.2d 857, 863 (Alaska 1981). See also Morris v. State, 630 P.2d 13, 17 (Alaska 1981). After an independent review of the record, we have decided to accept the state's confession of error. See Marks v. State, 496 P.2d 66, 67–68 (Alaska 1972). Even assuming that the existence of a conspiracy between Williamson and Orth had been independently established by a preponderance of the evidence, see Hawley v. State, 614 P.2d 1349, 1355 (Alaska 1980); Amidon v. State, 565 P.2d 1248, 1259 (Alaska 1977), it is difficult to conceive how Orth could be found to be advancing the purpose of the joint undertaking by casually divulging it to witnesses. Crump v. State, 625 P.2d 857, 863 (Alaska 1981). The statement attributed to Orth by Boyles, that Williamson left the bar "to roll a queer," can accurately be "described as a 'casual admission of culpability to someone [Orth] had individually decided to trust.'" Crump, 625 P.2d at 863 (quoting United States v. Moore, 522 F.2d 1068, 1077 (9th Cir.1975), cert. denied, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976)). We therefore hold that it was error to admit Orth's statement through Boyles' testimony.

The state contends, and, in his dissent, Judge Singleton agrees, that the admission of Orth's out-of-court statement was harmless error. The state argues that the jury's verdicts—which acquitted Williamson of robbery and second-degree murder while convicting him of manslaughter—indicate that the jury gave no weight to the inadmissible hearsay; the jury must have believed Williamson's version that Dunkin was the first aggressor because an acquittal on the murder charge is inconsistent with a finding that Williamson intended to rob Dunkin. The state interprets the manslaughter conviction as reflecting a belief by the jury that Dunkin initially attacked Williamson but that Williamson had a reasonable means of escape and was therefore not entitled to use deadly force in self-defense. According to the state, the jury must have reasoned that, although Williamson was not entitled to claim self-defense because his conduct was unreasonable, he had nonetheless been provoked and had killed Dunkin in the heat of passion.[3] The

liamson's comment that he thought he might need an attorney, which was made in conjunction with a declaration that he wanted to turn himself in, "did not reasonably imply that he was unwilling to speak about his case without counsel present, the right protected by Miranda." Mallott v. State, 608 P.2d 737, 742 n. 4 (Alaska 1980).

Because Williamson's reference to counsel was equivocal and because it was made before he was a suspect, his subsequent waiver of his Miranda rights is subject to an ordinary voluntariness analysis. After an independent review of the record, we are convinced, given the totality of the circumstances, that Williamson know-

ingly, intelligently and voluntarily waived his Miranda rights. See McMahan v. State, 617 P.2d 494, 498 (Alaska 1980); Quick v. State, 599 P.2d 712, 719 (Alaska 1979); Nashoalook v. State, 663 P.2d 975, 979 n. 2 (Alaska App.1983).

2. A.R.E. 801(d)(2)(E) characterizes as non-hearsay a statement offered against a defendant that is "a statement by a co-conspirator of a party [made] during the course and in furtherance of the conspiracy."

3. The jury was instructed in conformity with former AS 11.81.335 that "[a] person may not use deadly force ... if he knows that he can with complete safety as to himself and others

state concludes that if the jury had given any weight to Orth's statement Williamson's defense would have been completely rejected because it is inconsistent with a predetermined plan to rob Dunkin.

We cannot agree that allowing the jury to consider evidence of Orth's hearsay statement was harmless.[4] Although the state's theory is plausible, we cannot rely on after the fact speculation about the jury's deliberations to conclude that the jury disregarded the highly inflammatory hearsay testimony. Williamson's assertion of an innocent motive for leaving the Hallea Lodge was crucial to his claim of self-defense; the statement attributed to Orth by Boyles directly undermined Williamson's version of the events. Although the state presented other evidence to support its theory that Williamson had formulated a plan to rob Dunkin,[5] Orth's hearsay statement was the only unimpeached evidence supporting that theory. The state relied almost exclusively on Boyles' testimony during closing argument to support its theory.

Under the circumstances, the jury's verdicts could very possibly have been affected by Boyles' testimony concerning Orth's statement.[6] We therefore

---

avoid the necessity of so doing by retreating...." The jury was also instructed on the heat of passion defense.

**4.** We are inclined to believe that application of the constitutional harmless error standard is appropriate here, because the admission of Orth's out-of-court statement implicated Williamson's right to confrontation and cross-examination. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Hawley v. State,* 614 P.2d 1349, 1358 (Alaska 1980). But even if the hearsay statement was sufficiently reliable to avoid a violation of Williamson's confrontation right, *see Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), we would find the statement to be significantly more prejudicial than that found harmless in *United States v. Castillo,* 615 F.2d 878 (9th Cir. 1980), the case that Judge Singleton finds controlling. *See* dissenting opinion, *infra.* Particularly when combined with the trial court's erroneous exclusion of corroborating defense evidence, the admission of Orth's out-of-court statement cannot be deemed harmless under the non-constitutional standard, since it cannot fairly be said that the error had no effect on the jury's verdict. *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946); *Love v. State,* 457 P.2d 622, 630–32 (Alaska 1969).

**5.** For example, the state offered evidence to show that Dunkin was killed by a .357 weapon and that Orth's father was the owner of a .357 Colt Python. The state asked the jury to infer from this that Williamson and Orth went barhopping on Halloween night with a weapon in their possession and a predetermined plan to commit a robbery. However, Orth's father testified that he was satisfied that his gun had not been used because he had packed the weapon with three rounds of ammunition. When he checked it after the incident, it still contained three rounds. Further, because the recovered bullet was damaged, it could not be matched to

Mr. Orth's weapon. Finally, it was established at trial that Dunkin also owned a .357 Colt Python that he kept in the front seat area of his vehicle.

**6.** Specifically, we believe the state's harmless error theory overlooks several significant possibilities. For example, the acquittal on the murder charge and conviction of manslaughter might reflect a compromise between jurors who favored acquittal and other jurors who, influenced by evidence of Orth's statement, favored conviction of murder. Alternatively, if the manslaughter conviction reflects the jury's belief that Williamson was initially attacked by Dunkin but was not reasonable in using deadly force to defend himself, it is possible that evidence of Orth's statement may have colored the jury's perception as to the reasonableness of the actions Williamson took in self-defense. Finally, the state's harmless error theory disregards the possibility that the jury might have partially believed both Williamson's and the prosecutor's evidence. It would have been possible for the jury to believe, based on Orth's statement, that Williamson was armed and originally intended to rob Dunkin. The jury could nonetheless have believed Williamson's testimony that Dunkin attacked him first, for sexual reasons. Had the jury reached this conclusion, it might well have found that Williamson, since he had armed himself and come prepared to assault Dunkin, probably used excessive force and did not react reasonably in attempting to repel Dunkin's assault.

While the various ways in which the jury might have been influenced by evidence of Orth's hearsay statement may seem somewhat speculative and relatively unlikely, we cannot say they were not reasonably possible. Ultimately, in concluding that the admission of Orth's hearsay statement did not constitute harmless error, we are persuaded by the fact that the statement was a significant and highly

hold that the error in admitting Orth's hearsay statement was not harmless beyond a reasonable doubt and that Williamson's manslaughter conviction must be reversed.[7]

## EVIDENCE OF DUNKIN'S CHARACTER

Our disposition of this case requires us to discuss the other evidentiary issues Williamson has raised to provide guidance to the trial court on retrial.

Williamson contends that the trial court erred in excluding the testimony of Thomas Parkhurst. Williamson's offer of proof established that Parkhurst was willing to testify that he had had a similar encounter with Dunkin approximately one year prior to Williamson's offense. Parkhurst met Dunkin in a bar and Dunkin invited him to go outside and smoke a joint. Parkhurst accepted and they went out to Dunkin's car, where Dunkin pulled out a prescription bottle of Quaaludes and offered them to Parkhurst. Parkhurst would have testified that he ingested two or three Quaaludes and smoked two joints with Dunkin. Because he had been drinking heavily, Parkhurst became groggy and began to lose his coordination. Dunkin locked the doors of his vehicle at one point, explaining that he was paranoid about someone walking up to the car. Dunkin ultimately moved closer to Parkhurst, reached out for him, and told him that he was bisexual. Parkhurst jumped out of Dunkin's car to get away. Parkhurst was prepared to testify that this episode left him with the firm impression that Dunkin was attempting to eliminate his resistance with drugs and then homosexually rape him.

Judge Ripley ruled that Parkhurst would not be permitted to testify before the jury. He determined that Parkhurst's testimony was not probative on the issue of self-defense because it demonstrated his character for seduction rather than violence. He concluded that any probative value was outweighed by "the prejudice to the state, confusion of the issues, and the foreseeable waste of time."

Williamson challenges the exclusion of Parkhurst's testimony on appeal, arguing that Dunkin's conduct on the prior occasion was so similar to Williamson's account of the events on Halloween night of 1981, that the evidence was highly probative and should have been admitted as relevant character evidence under Alaska Rule of Evidence 404(a)(2).[8] We agree.

---

prejudicial item of evidence that was relied upon heavily by the prosecutor.

7. Williamson contends that the prosecutor's conduct in this case was the functional equivalent of a deliberate attempt to precipitate a mistrial. He argues, therefore, that retrial is barred by the prohibition against double jeopardy. *See Piesik v. State,* 572 P.2d 94, 96–97 (Alaska 1977); *White v. State,* 523 P.2d 428, 429 (Alaska 1974); *Muller v. State,* 478 P.2d 822, 827 (Alaska 1971).

We reject Williamson's contention. The rule requiring a reversal with prejudice only applies when the prosecutor deliberately engages in misconduct designed to precipitate a mistrial to avoid an acquittal because of a weakness in his own case. The district attorney in Williamson's case did not precipitate a mistrial. Further, the arguments made in support of Boyles' testimony were at most a zealous attempt "to bring before [the jury] all evidence which tended to establish the appellant's guilt." *White v. State,* 523 P.2d at 429–30. A new trial is therefore not barred.

8. A.R.E. 404(a)(2) provides, in relevant part:

(a) *Character Evidence Generally.* Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(2) *Character of Victim.* Evidence of a relevant trait of character of a victim of crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor, subject to the following procedure:

(i) When a party seeks to admit the evidence for any purpose, he must apply for an order of the court at any time before or during the trial or preliminary hearing.

(ii) The court shall conduct a hearing outside the presence of the jury in order to determine whether the probative value of the evidence is outweighed by the danger of unfair prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim. The hearing may be conducted *in camera* where there is a danger of unwarranted invasion of the privacy of the victim.

In *Kvasnikoff v. State,* 674 P.2d 302 (Alaska App.1983), a homosexual rape case, we reviewed the trial court's exclusion, under the rape victim shield law,[9] of evidence of the complaining witness' past homosexual behavior. We held that the trial court did not abuse its discretion in determining that the probative value of the evidence was outweighed by "the probability that its admission [would] create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim." *Id.* at 305–06. We noted that the rape victim shield statute rejected the archaic rule of relevancy which assumed that a person "who consented to sex with one individual was more likely to have consented to sex with another." *Id.* at 306. We also noted that the probative value of the evidence offered by Kvasnikoff was diminished by the fact that it did not "involve acts which were substantially similar to those charged." *Id.* at 306 n. 6.

However, we also recognized in *Kvasnikoff* that evidence of the victim's homosexual behavior on a prior occasion may be admissible under certain circumstances. Specifically, we said:

> Trial courts should focus on factors other than sexual preference in determining what evidence is relevant and has probative value with regard to the defense of consent. Evidence which tends to demonstrate past sexual conduct under circumstances which are substantially similar to the act now charged has greater probative value and relevancy. *See*

*State v. Mounsey,* [31 Wash.App. 511] 643 P.2d 892, 898 (Wash.App.1982). *Id.*

We believe that Williamson's case is distinguishable from *Kvasnikoff* and that evidence of Dunkin's character should have been admitted. Although the trial court's task under the rape shield statute is similar to the general test for admissibility of character evidence under A.R.E. 404(a)(2), the former was specifically designed to "minimize the embarrassment and humiliation to the prosecuting witness" in a rape case. *Kvasnikoff,* 674 P.2d at 305 n. 4. Concern for the sensibilities of the victim deserves substantially less weight in a murder case where the issue is self-defense and where the jury must determine who was the initial aggressor.

In addition, the probative value of Parkhurst's testimony in Williamson's case was bolstered by the substantial similarities between the two episodes. Parkhurst's testimony created more than a simple inference that Dunkin had a propensity to engage in homosexual conduct. If believed, Parkhurst's testimony would have created an inference that Dunkin had provided drugs for the purpose of luring Parkhurst into his car, lowering his resistance, and obtaining nonconsensual sex—a scenario almost identical to Williamson's account of his confrontation with Dunkin. Even if an element of violence or aggression was required to establish the relevancy of a homicide victim's past behavior, the potential for violence in the situation as

(iii) The court shall order what evidence may be introduced and the nature of the questions which shall be permitted.

**9.** AS 12.45.045 provides, in part:

(a) In prosecutions for the crime of sexual assault ... evidence of the complaining witness' previous sexual conduct shall not be admitted nor reference made to it in the presence of the jury except as provided in this section. When the defendant seeks to admit the evidence for any purpose, he may apply for an order of the court at any time before or during the trial or preliminary hearing. After the application is made, the court shall conduct a hearing in camera to determine the admissibility of the evidence. If the court finds that evidence offered by the defendant

regarding the sexual conduct of the complaining witness is relevant, and that the probative value of the evidence offered is not outweighed by the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the complaining witness, the court shall make an order stating what evidence may be introduced and the nature of the questions which shall be permitted....

(b) In the absence of a persuasive showing to the contrary, evidence of the complaining witness' sexual conduct occurring more than one year before the date of the offense charged is presumed to be inadmissible under this section.

Parkhurst described it was clear. The relevancy of Parkhurst's testimony was not diminished by the fact that he was able to escape before any violence occurred. Indeed, assuming Parkhurst's account is believed, the ease with which Parkhurst managed to escape might have been a factor which prompted Dunkin to use a greater level of force in his encounter with Williamson.

The relevancy of Parkhurst's testimony is highlighted by taking into account the diametrically opposed theories presented at trial. This was not simply a dispute between the prosecution and the defense about who was the initial aggressor. Rather, the state contended throughout trial and during closing argument that this was a case of premeditated robbery and murder, while the defense portrayed Williamson as an innocent victim of an attempted sexual assault. Under the circumstances, the probative value of Parkhurst's testimony was unquestionably great, since it tended to corroborate the totality of Williamson's testimony, and not just his account of who was the initial aggressor. Thus, the jury would have been much more likely to believe Williamson's testimony if it had heard and believed Parkhurst.

We conclude that on retrial Williamson should be allowed to present the testimony of Thomas Parkhurst.

### EVIDENCE THAT DUNKIN HAD QUAALUDES

■ Williamson next contends that the trial court erred in excluding evidence that police officers had found a partially used prescription bottle of Quaaludes and a prescription for Quaaludes in Dunkin's home during the investigation. The trial court found that this evidence fell within the protective order, issued earlier by the court, which banned evidence of Dunkin's character.

We believe that this evidence should be admitted on retrial. Evidence that Dunkin had access to Quaaludes is particularly relevant in light of the dispute between the prosecution and the defense about William-

son's motive for getting into Dunkin's car. The state maintained that Williamson brought a gun with him to the bar and had formed a plan to rob Dunkin, while the defense insisted that Dunkin lured Williamson into his car with a promise of Quaaludes. The fact that Dunkin had a partially empty prescription bottle of Quaaludes at his home had a tendency to make Williamson's version more likely than it would have been without the evidence. *See* A.R.E. 401. *See also Newsom v. State,* 533 P.2d 904, 908 (Alaska 1975).

Although perhaps incidentally reflecting on Dunkin's character, the extrinsic evidence offered by Williamson was probative of a fact that was directly in issue. Because Dunkin apparently had a valid prescription for the Quaaludes, the danger of embarrassing his family or unfairly prejudicing the state was slight. The dangers inherent in presenting extrinsic evidence on a collateral matter were not a factor. The presentation of this evidence would have taken very little time and the potential for confusing the jury was minimal. *See* A.R.E. 403. Thus, Williamson should be allowed to introduce evidence of Dunkin's access to Quaaludes on retrial.

### TAMPERING WITH PHYSICAL EVIDENCE

■ Williamson was convicted of two counts of tampering with physical evidence, in violation of AS 11.56.610(a)(1) and AS 11.56.610(a)(4). He received two concurrent five-year sentences. Williamson does not challenge these convictions or sentences on appeal. However, the state concedes that Williamson should only have received one sentence for tampering with the evidence in this case. We agree with the state and, finding plain error, we vacate Williamson's sentences on the tampering charges and remand for resentencing. Alaska R.Crim.P. 47(b).

Alaska Statute 11.56.610 provides:

*Tampering with physical evidence.* (a) A person commits the crime of tampering with physical evidence if the person

(1) destroys, mutilates, alters, suppresses, conceals, or removes physical evidence with intent to impair its verity or availability in an official proceeding or a criminal investigation;

(2) makes, presents, or uses physical evidence, knowing it to be false, with intent to mislead a juror who is engaged in an official proceeding or a public servant who is engaged in an official proceeding or a criminal investigation;

(3) prevents the production of physical evidence in an official proceeding or a criminal investigation by the use of force, threat, or deception against anyone; or

(4) does any act described by (1), (2), or (3) of this subsection with intent to prevent the institution of an official proceeding.

(b) Tampering with physical evidence is a class C felony.

It seems apparent that subparagraph (a)(4) simply provides an alternative *mens rea* for each of the three other subsections. Where, as here, only one act of tampering is alleged by the state,[10] a defendant cannot be convicted of two counts merely because he may have simultaneously entertained both of the alternative mental states. We therefore accept the state's concession of error and hold that only one sentence was appropriate in Williamson's case. *See Whitton v. State*, 479 P.2d 302, 312 (Alaska 1970).

Williamson's conviction for manslaughter is REVERSED and the case is REMANDED for a new trial. Williamson's sentences for tampering with physical evidence are

VACATED and the case is REMANDED for resentencing.

SINGLETON, Judge, dissenting.

Williamson argues, and the state concedes, that the trial court committed error when it permitted witness Boyles to testify that Otis Orth told her "[Williamson] went out to roll a queer [who] had a lot of money." The court accepts the state's concession of error and so do I. *See Marks v. State*, 496 P.2d 66, 67–68 (Alaska 1972). The court goes on to reject the state's contention that the error was harmless, *see* Criminal Rule 47(a), despite the fact that the jury acquitted Williamson of felony murder and convicted him of manslaughter. I disagree with this conclusion, would find the error harmless, and affirm.[1]

The majority reasons that Otis Orth's statement was hearsay which did not fall within the co-conspirator exception to the hearsay rule because it was not made "in furtherance of the conspiracy." A.R.E. 801(d)(2)(E). I agree with this conclusion. Consequently, the majority concludes it automatically violated the confrontation clause to the United States Constitution, requiring application of the constitutional harmless error doctrine. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1965).

The majority is in error. A violation of the hearsay rule, adverse to a defendant, does not necessarily violate the confrontation clause. In *California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26

---

**10.** In closing argument, the prosecutor explained the difference between the two tampering counts as follows:

[The second count] discusses the same things, but the intent is slightly different.... [W]hat differentiates the two counts in that regard is that as to [the second count], there's a fourth element that's required that his intent be that he intended to prevent the institution of an official proceeding and those are separate offenses....

**1.** A majority of the court also concludes that the trial court erred in excluding evidence of a prior

attempted homosexual seduction of a third party and evidence that the victim had a prescription for the drug Quaaludes. While I disagree with these conclusions as well, I do not understand the majority to indicate that these alleged errors, standing alone, would have justified reversal of Williamson's manslaughter conviction. I am satisfied that the evidence in question, while arguably relevant, was subject to A.R.E. 403. I would not find an abuse of discretion. Alternatively, I would find any errors in this regard harmless because of the jury's manslaughter verdict.

L.Ed.2d 489, 495–96 (1970), the Supreme Court said:

> While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. *The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied.* (Emphasis supplied, citations and footnote omitted.)

The requirement that a conspirator's hearsay statement must be "in furtherance of the conspiracy" to be admissible against his accomplice is not required by the constitution. *See Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). In a given case, whether a statement is or is not "in furtherance of a conspiracy" may be relevant in determining whether a statement was admitted in violation of the confrontation clause. *United States v. Castillo,* 615 F.2d 878 (9th Cir.1980).

A hearsay statement may be admitted without violating the confrontation clause if the declarant is unavailable and the statement has certain indicia of reliability. Otis Orth was a codefendant. The unavailability of a potential codefendant may normally be presumed since the codefendant will probably exercise his fifth amendment rights. *See Galauska v. State,* 527 P.2d 459, 465 (Alaska 1974), *modified on other grounds,* 532 P.2d 1017 (Alaska 1975); *Gutierrez v. State,* 673 P.2d 287, 289–90 (Alaska App.1983).

In considering indicia of reliability it is helpful to refer to a four-factor test suggested by Justice Stewart in his plurality opinion in *Dutton v. Evans,* 400 U.S. at 88–89, 91 S.Ct. at 219–20, 27 L.Ed.2d at 227. First, did the statement contain an express assertion about a past fact; second, did the declarant have personal knowledge of the identity and role of the other participants in the criminal enterprise; third, is it possible that the declarant's statement was based on faulty recollection; and, fourth, under the totality of the circumstances, was there reason to believe that the declarant had a motive to falsely implicate the defendant. The Alaska Supreme Court recommends use of a similar test. *Hawley v. State,* 614 P.2d 1349, 1358–59 (Alaska 1980) (citing *United States v. Snow,* 521 F.2d 730, 734–36 (9th Cir.1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976) (relying upon *Dutton* )).

Applying this test to Orth's alleged statement, it is clear that there are sufficient indicia of reliability. First, the statement contained no assertion about a past fact; it involved a prediction of future conduct and, consequently, it carried on its face a warning to the jury against giving it undue weight. Second, Orth's personal knowledge of the identity and role of Williamson was abundantly established by evidence showing that Orth and Williamson were together shortly before the incident in question and the undisputed testimony that Orth assisted Williamson in disposing of Dunkin's body after the killing. Paraphrasing Justice Stewart, it is inconceivable that cross-examination could have shown that Orth was not in a position to know Williamson's intentions in entering the car with Dunkin. Third, it is inconceivable that Orth's statement was based on faulty recollection since Orth and Williamson had been together only a short period before and any discussion they had must have occurred at that time. Finally, there is nothing in the record to suggest that Orth would have intentionally misrepresented Williamson's intentions or sought to falsely accuse him of a crime. Orth was speaking to a friend. He was not under custodial interrogation. Thus it cannot be inferred that he made the

statement to curry favor with the prosecution. Consequently, admission of the statement did not violate the confrontation clause. *United States v. Castillo*, 615 F.2d 878 (9th Cir.1980).

The Ninth Circuit found harmless error on surprisingly similar facts in *Castillo*. Castillo was charged with murder in connection with the death of a fellow inmate in a federal correctional institution. Evidence established that Castillo and his victim belonged to rival factions within the institution and that the victim had on a number of occasions assaulted Castillo. Castillo conceded stabbing the victim, but claimed he acted in self-defense. During trial a prosecution witness was allowed to testify, over defense objection, to statements allegedly made by two of Castillo's alleged confederates. The informant related a conversation with a friend of Castillo's in which he asked "what was happening," to which the friend replied, "We are fixing to kill a Mexican." The court allowed the testimony in order to show a conspiracy to commit murder in which Castillo was a member. The Ninth Circuit found that the statements were erroneously admitted because they were not made "in furtherance of the conspiracy." F.R.E. 801(d)(2)(E). The court said:

> There is nothing in the record to indicate that Peterson somehow intended to further a conspiracy to kill Flores by announcing its object to Nealy. At most, Peterson made nothing more than a casual admission to someone he had decided to trust.

615 F.2d at 883 (citations omitted). The court applied the four-factor *Dutton* test and concluded that while the admission of the testimony violated the hearsay rule, it did not violate the confrontation clause. That analysis applies equally here. The court went on to apply the normal nonconstitutional harmless error standard. It concluded that since the evidence would most likely have gone to premeditation, and since the jury, in finding Castillo guilty only of voluntary manslaughter, had rejected the government's contention that the killing was premeditated, the error was

more probably than not harmless. The same result should follow in this case.

The majority's suggestion in footnote 6 that Williamson was prejudiced because the jury might have reached a compromise on the manslaughter verdict, in violation of the jury instructions, is particularly troubling. If we are to assume that the jury disregarded its instructions, it is unlikely that we could ever find harmless error. There is nothing in the record to suggest compromise in this case. The risk of a compromised verdict exists in every case.

I would affirm the decision of the superior court.