State of Nebraska, appellee, v. Dennis D. Lowe, appellant.
505 N.W.2d 662

Filed September 17, 1993.    No. S-92-788.

James Martin Davis for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

HASTINGS, C.J.

The defendant was convicted of second degree murder and use of a deadly weapon in the commission of a felony following a jury trial in the district court for Douglas County. He appeals,

assigning as error (1) the exclusion of evidence of the homosexual conduct of the victim, (2) the exclusion of testimony of an expert witness, (3) the refusal by the court of a tendered instruction, and (4) the imposition of excessive sentences. We affirm.

On the morning of January 11, 1992, the body of the male victim was discovered in an isolated area of Omaha known as Bum's Hollow. The victim's body was lying faceup on the ground next to the driver's side of his pickup truck. The victim's face was covered with blood, and it appeared that he had been beaten. The victim's body was clothed, but the zipper of his jeans was found to be completely unzipped, and it did not appear that he was wearing underwear. Later examination disclosed that his underwear was pulled down and contained within the leg area of his jeans. An autopsy revealed that the cause of death was multiple injuries to the face and head caused by approximately seven or eight blows with a blunt instrument.

The defendant had been drinking beer during the evening of January 10 at an Omaha bar. At closing time, the defendant made arrangements to attend a party in the area of 6th and Pierce Streets. However, he was unable to find the location of the party. The defendant had been drinking from a quart bottle of malt liquor, and he eventually stopped his vehicle and, after urinating, fell asleep or passed out in his truck with the radio playing. He stated that he was on the driver's side of the vehicle, leaning to the right, half lying on his side, and up against the back of the seat. The next thing the defendant remembered, according to his testimony, was a man hovering over and fondling him. The defendant stated that this man was in the process of unbuttoning the defendant's pants and reaching down into the defendant's genital area.

The defendant testified that he then "freaked, got scared," and he went on to explain, "I don't know the word you'd use; lost it mentally for a second or two." He remembered that he started swinging his flashlight that had been on the seat of his vehicle, but could not recall how many times he swung the flashlight or that he even hit the man. He stated that he could hear the man snoring, but it was dark, and he could not see the man on the ground in any detail, although he could see the

shape of the man's body. He also stated that he was confused after the man fell to the ground and that he then got into his vehicle and went home.

When the defendant arrived home, he went downstairs, took a shower, and washed off the flashlight. He encountered his father on the landing of the stairs and told him he had been in a fight. The next morning, the defendant's father awakened him and informed him that the police had found a man dead in the area of 6th or 3d and Center. The defendant testified that after he discussed the situation with his family for a couple of hours, they all agreed that it would be best if he turned himself in.

The defendant contends that during the trial, the court erred in excluding evidence that on December 14, 1987, the victim and another person were arrested for lewd conduct in the restroom of a department store; i.e., this other person was masturbating at a urinal, and the victim in this case was masturbating in a toilet stall. By means of an offer of proof, it was disclosed that this other person told the prosecution that although he was not acquainted with the victim in this case, the place where the two of them were arrested was a place where homosexuals met. This person also testified that when he went into the restroom, "someone" in the stall was tapping a foot on the floor, supposedly a common signal for homosexual activity. The court rejected the offer of proof and refused to admit the evidence. There was no evidence of any contact between the two men.

The court also sustained the State's motion in limine to prevent possible evidence that on one occasion some unknown person or persons broke into the house where the victim was living with his parents and "wrote gay or words to that effect on the wall" and that at one time the victim had a window of his pickup truck "broken out and maybe some things yelled at him about being a gay or homosexual."

The defendant contends that the victim's character trait of being homosexual was an essential element of his defense that he was the victim of a homosexual attack and that the trial court should have respected his Sixth Amendment rights and allowed him to adduce the offered testimony under Neb. Evid. R. 405(2), Neb. Rev. Stat. § 27-405(2) (Reissue 1989). However,

the trial court ruled that there was not enough similarity in the actions described to justify admission of the testimony.

Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 1989), states:

(1) Evidence of a person's character or a trait of his or her character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion, except:

. . . .

(b) Evidence of a pertinent trait of character of the victim of the crime offered by an accused or by the prosecution to rebut the same . . . .

Rule 405 provides:

(1) In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(2) In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

The first question is whether the testimony concerning a specific instance of the victim's conduct is relevant to the issue of self-defense.

All relevant evidence normally is admissible. Evidence which is not relevant is not admissible. Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 1989). Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1989).

In *State v. Dixon*, 240 Neb. 454, 457-58, 482 N.W.2d 573, 576 (1992), this court noted:

"There are two components to relevant evidence: materiality and probative value. Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue,

the evidence is immaterial. What is 'in issue,' that is, within the range of the litigated controversy, is determined mainly by the pleadings, read in the light of the rules of pleading and controlled by the substantive law. . . .

"The second aspect of relevance is probative value, the tendency of evidence to establish the proposition that it is offered to prove. . . . A fact that is 'of consequence' is material, and evidence that affects the probability that a fact is as a party claims it to be has probative force. . . . Such evidence often is said to have 'logical relevance,' while evidence lacking in probative value may be condemned as 'remote' or 'speculative.' "

Quoting 1 McCormick on Evidence § 185 (John W. Strong 4th ed. 1992).

Probative value is a relative concept; the probative value of a piece of evidence involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the particular fact from the ultimate issues of the case. *State v. Dixon, supra*; *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991).

Other courts have examined the relevance of evidence of a victim's prior homosexual conduct when the defendant has claimed self-defense, with dissimilar results.

In *State v. Bell*, 60 Wash. App. 561, 805 P.2d 815 (1991), a defendant charged with second degree murder sought to introduce the testimony of nine lay witnesses; some of these witnesses would have testified that the victim had a reputation in the community as a homosexual, and others would have testified that they knew of specific instances in which the victim displayed homosexual conduct. The Court of Appeals of Washington found that under the applicable rules, evidence of specific instances of the victim's past homosexual behavior was inadmissible. The court further noted that while evidence of a victim's reputation may be admitted under certain circumstances to show that the victim acted in conformity with his or her character where the defendant claims that he acted in self-defense, the testimony would not be relevant in that case, reasoning:

While evidence of [the victim's] reputation as a

homosexual may tend to prove that he grabbed at [the defendant's] crotch and attempted to kiss him, these facts are not "of consequence to the determination of the action", because the defense of self-defense is only available to a defendant who is responding to a perceived threat of great bodily harm or to the victim's commission of a violent felony.

*Id.* at 564-65, 805 P.2d at 817.

In *Kagebein v. State*, 254 Ark. 904, 496 S.W.2d 435 (1973), the appellant asserted that the victim's death came about because of the appellant's resistance to the victim's homosexual advances. The appellant argued that he should have been permitted to introduce evidence which would have tended to corroborate his claim that homosexual activities preceded the killing. The Arkansas court agreed, noting that

[o]ne reason for allowing evidence of prior sexual misconduct when the case involves similar activity is that the extremely high degree of relevancy of such evidence outweighs the prejudice that may be caused to the defendant. If permitted as an exception when a defendant's life or liberty is at stake, it would seem that "specific act" evidence of similar prior sexual behavior of a victim, where only reputation is at stake, would be a more compelling exception.

*Id.* at 910, 496 S.W.2d at 439.

In an Alaska case, *Williamson v. State*, 692 P.2d 965 (Alaska App. 1984), the defendant testified that he was sexually assaulted after going for a ride with the victim and accepting two or three Quaaludes from him. The defendant contended that the trial court erred in excluding the testimony of a man who would have testified to a similar encounter with the victim approximately 1 year earlier. The trial court had determined that the testimony was not probative on the issue of self-defense because it demonstrated the victim's character for seduction rather than violence, and the court had concluded that any probative value was outweighed by the prejudice to the state, confusion of the issues, and foreseeable waste of time. The appellate court found that evidence of the victim's prior conduct was highly probative and should have been admitted as

relevant character evidence. In distinguishing this type of evidence from evidence which is inadmissible under the state's rape shield statute, the court reasoned that "[c]oncern for the sensibilities of the victim deserves substantially less weight in a murder case where the issue is self-defense and where the jury must determine who was the initial aggressor." 692 P.2d at 972.

The defendant cites *Parisie v. Greer*, 671 F.2d 1011 (7th Cir. 1982), in which a Seventh Circuit panel found that the trial court committed reversible error in excluding the testimony of three witnesses who would have testified to the homosexuality of the victim. The circuit court noted that exclusion of the proffered testimony deprived the defendant of vital corroborative evidence, both as to his credibility and the deceased's homosexuality. However, on rehearing en banc, the circuit court vacated the panel's decision and affirmed the judgment of the trial court, which had denied defendant's petition for habeas corpus, although no single opinion commanded the support of a majority of the circuit court's members. *Parisie v. Greer*, 705 F.2d 882 (7th Cir. 1983), *cert. denied* 464 U.S. 918, 104 S. Ct. 284, 78 L. Ed. 2d 261, *cert. denied* 464 U.S. 950, 104 S. Ct. 366, 78 L. Ed. 2d 326. In a decision which generated six separate opinions, the opinions of Judge Posner and Judge Swygert represent the disparity in the postures with which evidence of a victim's homosexuality is viewed. Judge Posner wrote:

> I cannot agree that the appellant is entitled to a new trial so that he can introduce evidence that his murder victim was a homosexual, or even that a remand for further exploration of the question in the district court is warranted. Parisie wants the evidence admitted in order to bolster his defense of "homosexual panic," which is the idea that a latent homosexual—and manifest "homophobe"—can be so upset by a homosexual's advances to him that he becomes temporarily insane, in which state he may kill the homosexual. It is no business of mine whether the State of Illinois chooses to recognize a defense of "homosexual panic" as a subcategory of the insanity defense, but I cannot believe that the Constitution of the United States requires a state to allow defense

counsel in a murder case to defame the murderer's victim as a homosexual without satisfying the normal prerequisite to admitting evidence of reputation—that the evidence " 'be based upon contact with the subject's neighbors and associates rather than upon the personal opinion of the witness.' "

705 F.2d at 893. In contrast, Judge Swygert wrote:

> [Parisie's] attempts to bolster his assertion that the triggering event—the homosexual advance—had occurred, however, were frustrated by the trial court's exclusion of testimony that Jackson had a reputation as and was a homosexual. Although the court acknowledged that such testimony was "very important" and "would be admissible," it granted the widow and children's motion in limine and issued an order prohibiting the mention of the victim's homosexuality. . . .
>
> . . . .
> . . . The proof offered at the time the testimony of the three witnesses was excluded was defense counsel's statement that the witnesses would testify that they were acquainted with the deceased, knew his reputation as a homosexual, and had engaged in homosexual acts with him . . . .
>
> . . . .
> There is no consensus even in the medical and psychiatric communities whether homosexuality is a character trait (which would generally be provable under Illinois law only by evidence of reputation . . .) or a medical condition (which would surely be directly provable by evidence of symptoms). In either case, however, evidence of Jackson's homosexuality would be relevant under the Illinois standard of relevancy . . . (relevant evidence is that "which tend[s] to make the proposition at issue more or less probable") . . . because his homosexuality made it likelier that he made a homosexual advance toward Parisie. . . .
>
> . . . .
> The reason the trial court excluded all testimony concerning the victim's homosexuality despite its

acknowledged relevance appears to have been concern about its possible harmful effect on the victim's family. I assume that this decision did not constitute an abuse of discretion under applicable state law. The ultimate questions in this case are whether state law is entitled to authorize that choice, limiting the defendant's constitutional right to present a defense, and if not, whether the erroneous exclusion rendered the trial unfair.

A defendant's right to call witnesses in order to present a defense, rooted in the sixth amendment and applied to the states through the due process clause of the fourteenth amendment . . . is strong. . . . If I were deciding, as an issue of first impression, whether the state's solicitude for the victim's reputation could override this strong constitutional right, I would not hesitate to conclude that it could not. I am spared making even that decision, however, for the Supreme Court has reached the same conclusion in weighing similar interests. In *Davis v. Alaska*, 415 U.S. 308, 319-20, 94 S.Ct. 1105, 1111-12, 39 L.Ed.2d 347 (1974), it held that a state's interest in protecting the anonymity of juvenile offenders by preventing impeachment on the basis of their juvenile records could not outweigh the defendant's interest in cross-examining witnesses against him: "Whatever temporary embarrassment might result to [the witness] or his family by disclosure of his juvenile record . . . is outweighed by petitioner's right to probe into the inference of possible bias . . . .

". . . .

". . . [T]he State's desire that [the witness] fulfill his public duty to testify free from embarrassment and with his reputation unblemished must fall before the right of petitioner to seek out the truth in the process of defending himself." If anything, in *Davis* the state's interest in shielding its youth was stronger than the state interest here, because it was a generalized, statutory policy choice rather than the discretionary choice of a single judge. I conclude that the exclusion of the testimony was not warranted by a sufficiently strong state interest.

(Citations omitted.) 705 F.2d at 899-902.

Evidence of a murder victim's homosexuality may be admissible as corroborative of a defendant's claim of self-defense from a homosexual assault, provided such evidence as tendered is probative of that defense. Here, the offered evidence falls far short of being probative of that issue. There is no foundation for drawing an inference of homosexuality from the fact of masturbation. The painting of the word "gay" by unknown persons on a house or truck or the tapping of a foot by someone not even identified by the witness lacks probative value alone to establish the proposition advanced, and such evidence is remote or speculative and properly was not admitted.

The defendant next contends that the trial court erred in excluding the testimony of the defendant's expert, Dr. Beverly Mead. In its offer of proof, the defense stated that Dr. Mead would have testified that based on the defendant's level of intoxication, he would not have been able to form the necessary intent to commit the crime of second degree murder and, further, that what he did was reasonable under the circumstances he was faced with.

In regard to expert testimony, Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1989), provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *State v. Reynolds*, 235 Neb. 662, 683, 457 N.W.2d 405, 418 (1990), this court stated that " '[e]xpert testimony is permitted even in areas where laymen have competence to determine the facts testified to by the expert where a trial court may feel the opinion would assist them' "; i.e., it would be helpful to the trier of fact. The court went on to discuss the "helpfulness standard" as expressed in rule 702:

> "The helpfulness test subsumes a relevancy analysis. In making its determination, the court must proceed on a case-by-case basis. Its conclusions will depend on (1) the court's evaluation of the state of knowledge presently

existing about the subject of the proposed testimony and (2) on the court's appraisal of the facts of the case."
235 Neb. at 683, 457 N.W.2d at 419, quoting 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence § 702[02] (1988). The court concluded that under this helpfulness standard, a court may exclude an expert's opinion which is nothing more than an expression of how the trier of fact should decide a case, and that when an expert's opinion on a disputed issue is a conclusion which may be deduced equally as well by a trier of fact with sufficient evidence on the issue, the expert's opinion is superfluous and does not assist the trier in understanding the evidence or determining a factual issue.

Other jurisdictions have considered the admissibility of expert testimony in regard to the effect of intoxication on a defendant's capacity to form intent. See, e.g., *Com. v. Edwards*, 521 Pa. 134, 555 A.2d 818 (1989) (psychiatrists' testimony that in their opinion defendant was not so intoxicated as to be unable to form specific intent to kill was admissible in prosecution for first degree murder and rape to rebut testimony of defendant's expert that defendant could not have formed specific intent to kill); *People v Bowers*, 126 A.D.2d 897, 511 N.Y.S.2d 177 (1987) (where defendant asserted degree of intoxication negated requisite intent, court held no abuse of discretion in excluding expert testimony, since there was ample evidence of defendant's inebriation and the jury could be presumed to be familiar with the effects of alcohol on an individual's mental state); *State v. Rivera*, 152 Ariz. 507, 733 P.2d 1090 (1987) (because effect of alcohol intoxication is a subject matter within common knowledge and experience of the jury, trial court can properly preclude expert testimony relating to the effect of alcohol upon the ability to form specific intent); *State v. Yates*, 392 N.W.2d 30 (Minn. App. 1986) (testimony of physician who would have testified about the effects of alcohol consumption intermixed with Talwin was not admissible on issue of specific intent of defendant charged with assault who had not raised insanity defense; juries are capable of evaluating effects of intoxicants on a defendant's ability to form intent); *Burnham v. State*, 497 So. 2d 904 (Fla. App. 1986) (because voluntary intoxication is a valid defense to

specific intent crimes, testimony concerning appellant's intoxication, if otherwise admissible, was relevant to appellant's defense); *State v. Barranco*, 73 N.C. App. 502, 326 S.E.2d 903 (1985) (expert witness in field of forensic psychiatry entitled to render opinion that defendant's intoxication did not mitigate his ability to form specific intent); *Turk v. State*, 662 P.2d 997 (Alaska App. 1983) (in prosecution for robbery, exclusion by trial court of testimony of defendant's expert witness regarding effect of defendant's alcohol and drug use on his ability to formulate specific intent necessary for conviction was reversible error); *People v Cronin*, 60 N.Y.2d 430, 458 N.E.2d 351, 470 N.Y.S.2d 110 (1983) (while jurors might be familiar with effects of alcohol on one's mental state, combined impact of case of beer, several marijuana cigarettes, and 5 to 10 Valium tablets on person's ability to act purposefully cannot be said as a matter of law to be within ken of typical juror). Some courts have emphasized that the need for expert testimony is greater where the defendant has been under the influence of intoxicants other than alcohol, or mixed with alcohol. See, e.g., *id.*; *State v. Betancourt*, 131 Ariz. 61, 638 P.2d 728 (Ariz. App. 1981) (refusal to allow defendant's medical expert to testify to effect of LSD on average human was error in light of fact that effect of LSD on the human mind was not necessarily within common experience and knowledge of jury); *Fouts v. State*, 374 So. 2d 22 (Fla. App. 1979), *overruled on other grounds, Parker v. State*, 408 So. 2d 1037 (Fla. 1982) (while effects of alcohol may be commonly known, assistance of expert would ordinarily be necessary for a jury to understand the effects of LSD). But see *State v. Yates, supra.*

In the instant case, the defendant testified that he drank beer while at the bar, at the rate of three to four glasses an hour, and that he had in his car a quart of malt liquor which he was drinking while he looked for the party. When questioned about what he did when he awoke and saw the victim, the defendant stated, "I don't remember from there. I just woke up from a deep sleep, and when I woke up, I was still drunk." A friend of the defendant's also testified that the defendant was drinking at the rate of two to three beers an hour and that the friend had brought two quarts of beer over to the defendant's home earlier

in the evening. There is nothing in the record which would indicate that the type or level of intoxication was such that expert testimony would be necessary to assist the jury in understanding the evidence. Thus, the trial court did not err in excluding the testimony of Dr. Mead on the issue of the effect of alcohol on the defendant's capacity to form the intent necessary to commit second degree murder; this assignment of error is therefore without merit. Similarly without merit is the defendant's assertion that Dr. Mead should have been allowed to testify to the reasonableness of the defendant's actions. The defendant did not claim to have any mental illness or defect which would have caused a response that would have been beyond the understanding of the jury. In its offer of proof, the defense stated that Dr. Mead would have testified:

[B]ased on the fact that he was being fondled in the area that he was in, the physical circumstances and surrounding area being dark, the fact that he did not know if his assailant had a weapon, that what he did was reasonable under the circumstances based on what he was faced with, and that the fact that he did not run was reasonable.

While this combination of events may be unique to this case, these events are all factors which jurors are capable of understanding and evaluating without the assistance of an expert's conclusions.

The defendant next asserts that the court erred in refusing to substitute the term "sexual assault" for "sexual intercourse," or in failing to add "sexual contact" as a justification for the use of deadly force in its self-defense instruction. The defendant argues that the instruction was confusing because it did not make clear that the use of force can be justified in protecting oneself from a homosexual attack.

The jury instruction on self-defense, instruction No. 12, which reflected the language of Neb. Rev. Stat. § 28-1409 (Reissue 1989), stated in part:

2. The use of force upon or toward another person is justifiable when the actor believes such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other

person on the present occasion.

3. The use of deadly force shall not be justifiable unless the actor believes that such force is necessary to protect himself against death, serious bodily harm, kidnapping or sexual intercourse compelled by force or threat . . . .

While the defendant contends that the term "sexual contact" or "sexual assault" should have been included in this instruction, this addition would misstate the law, since obviously sexual contact and sexual assault encompass a range of conduct not defined by the statutory terminology of "sexual intercourse." However, in response to the defendant's concern that the jury would not interpret the term "sexual intercourse" to include homosexual behavior, the court gave instruction No. 7, which defined sexual intercourse as "sexual intercourse in its ordinary meaning, fellatio or anal intercourse" and included the definition of fellatio.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Grant*, 242 Neb. 364, 495 N.W.2d 253 (1993); *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990).

If the jury instructions, when read together, correctly state the law, are not misleading, and adequately state the issues, there is no prejudicial error. *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993); *State v. Beins*, 235 Neb. 648, 456 N.W.2d 759 (1990).

The defendant refers us to *People v Coleman*, 122 A.D.2d 568, 569, 504 N.Y.S.2d 949, 950 (1986), in which the appellate court found that the trial court had erred in giving jury instructions which failed to include defense against "an attempted forcible sodomy" as one of two distinct grounds for the justified use of deadly physical force. However, the defendant does not offer any explanation of how this terminology would have been preferable to what was stated in instructions Nos. 7 and 12, nor does the record reflect that this terminology was proposed to the court during the instruction

conference.

Here, the instructions, when read together, correctly stated the law of self-defense as expressed in § 28-1409, adequately defined the terminology, and were not misleading to the jury. Thus, the defendant's third assignment of error is without merit.

In his final assignment of error, the defendant asserts that the trial court erred in imposing excessive sentences. The court sentenced the defendant to life in prison on the conviction of second degree murder, with credit for 60 days served, and to 4 to 6 years in prison for use of a weapon in the commission of a felony, to run consecutively to his sentence on the first count.

A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *State v. Ellen*, 243 Neb. 522, 500 N.W.2d 818 (1993); *State v. Philipps*, 242 Neb. 894, 496 N.W.2d 874 (1993).

An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *State v. Philipps, supra*; *State v. Reynolds*, 242 Neb. 874, 496 N.W.2d 872 (1993).

In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the *amount of violence involved in the commission of the crime. State v. Ellen, supra*; *State v. Philipps, supra*.

The defendant was convicted of the offense of second degree murder, in violation of Neb. Rev. Stat. § 28-304 (Reissue 1989), a Class IB felony. The sentence for a Class IB felony ranges from a 10-year minimum to life in prison.

This was a senseless and brutal crime. According to the evidence and the opinion testimony of the pathologist, the jury could have concluded that the victim was struck a severe blow to the back of his skull, fell on his back, and then received seven or eight crushing blows to the face and front of the skull. The injuries resulting consisted of bruising, bleeding, and a fractured and terribly misshapen skull. The instrument used to

deliver these blows was a six-cell flashlight weighing slightly more than 3 pounds.

Considering the nature and seriousness of the crime, although being aware of the relatively clean record of the defendant, we cannot say the trial court abused its discretion in imposing the sentences that it did.

The judgment of the district court is affirmed.

AFFIRMED.