STATE OF NEBRASKA, APPELLANT, V. MARIO ESCAMILLA, APPELLEE.

511 N.W.2d 58

Filed January 28, 1994.   No. S-92-347.

14

Gary E. Lacey, Lancaster County Attorney, and Joseph P. Kelly for appellant.

Rodney M. Confer, of Knudsen, Berkheimer, Richardson & Endacott, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, and LANPHIER, JJ.

HASTINGS, C.J.

The State of Nebraska appeals an order of the Lancaster County District Court which granted defendant Mario Escamilla's motion for postconviction relief, set aside his conviction of murder in the first degree, and permitted him to withdraw his plea of guilty. The issue tried before the district court was whether Escamilla pled guilty to first degree murder because of ineffective assistance of counsel.

On appeal from a proceeding for postconviction relief, the trial court's findings of fact will be upheld unless such findings are clearly erroneous. *State v. Johnson*, 243 Neb. 758, 502 N.W.2d 477 (1993); *State v. Moss*, 240 Neb. 21, 480 N.W.2d 198 (1992).

## FACTS

Shortly after 9 a.m. on July 3, 1986, the male victim was found dead in his home at 3035 Vine Street in Lincoln. It was later determined that the cause of death was hemorrhaging from multiple stab wounds.

Later that morning, Officer Steven Standley of the Lincoln Police Department noticed Mario Escamilla at the intersection of 70th and Fremont Streets in Lincoln. Standley had heard an earlier radio transmission describing a suspect of an investigation of a crime in the area of 30th and Vine and contacted Escamilla because he matched that description. Escamilla told the officer his name and address and that he was on parole because he had stabbed a man in Scottsbluff as a result of a sexual assault that had occurred when he was a child. Standley called Sgt. Kenney Schacht at the crime scene at Vine Street to tell him about Escamilla. Standley told Schacht that he was a friend of the person Escamilla was living with and that he believed Escamilla could be contacted later if necessary. Schacht then advised him that Escamilla could be released.

However, after learning that Escamilla was on parole for a stabbing that appeared to be sexually motivated, Schacht asked Standley to recontact Escamilla and ask him to come to 30th and Vine to be interviewed. Standley and Officer Mark Johnson contacted Escamilla at his residence and asked him to go to 30th and Vine, and he agreed to do so. Escamilla was patted down before being placed in the police vehicle. He was interviewed by Lt. Lee Wagner at the crime scene, and he then agreed to go to police headquarters for further questioning.

After arriving at police headquarters, Escamilla was interviewed by Standley, and later by Sgt. Tim Domgard. Escamilla initially denied involvement with the homicide, but later admitted that he "did it." At that point, he was advised of his *Miranda* rights and was asked to give a tape-recorded statement, which he agreed to do.

According to his statement, Escamilla was walking by the victim's house when the man spoke to him and said that he looked like he was lost. Escamilla then asked if he could use a telephone, and the man agreed that he could. While Escamilla was using the phone, he heard the man shut and lock the door, and then the man came up behind him, rubbed up against him, and tried to touch his scrotum. Escamilla stated that he reacted by picking up a knife that he saw on the kitchen counter and stabbing the man in the neck, and the victim fell to the floor. Escamilla recalled being raped when he was 6 years old, which

recollection caused him to become more aggressive with the victim. He stated that the victim enjoyed being called a "faggot" and told him that he would do anything Escamilla wanted and that he loved him. Escamilla said that he got more aggressive and told the victim to take down his pants. The victim told him that he, Escamilla, did not have to stab him and that he would do anything Escamilla wanted. Escamilla then took the victim's pants down a little bit, "Didn't really want to do it because that's not my thing, but to push off the aggressiveness, to make him feel hurt before I did." Escamilla further stated that he "just got on top get [sic] rubbed against him but, uh, didn't not have no anal sex or nothing like that." However, Escamilla admitted that he took his own pants down a little bit, and "I put a little [Vaseline] on there . . . on his anal [sic]." Escamilla said that he continued to stab the victim and that then, regaining his "senses," he unlocked the door and ran. At the time of Escamilla's plea, the county attorney, in reciting a factual basis for the plea, stated that Jody Toledo, at whose home Escamilla was visiting the night before the killing and the early morning of the day of the killing, would say that she had two steak knives that she had obtained in Arizona. At the scene of the murder, the police found a knife that matched a knife found in Toledo's apartment.

The murder victim was found nude from the waist down except for blue socks on each foot and a pair of boxer shorts around the left ankle. A dark brown pubic hair was found on his bare posterior. Laboratory examination disclosed the hair possessed characteristics similar to the known pubic hairs of Escamilla. A jar of Vaseline was found floating in the stool in the bathroom. However, the autopsy report disclosed no Vaseline on the victim's body.

Escamilla was charged with first degree murder and use of a deadly weapon to commit a felony. In July 1986, two attorneys from the public defender's office were assigned to represent him. At his arraignment on April 27, 1987, he pled not guilty to both counts.

Early in the case, Escamilla's lead counsel spoke with the deputy county attorney in regard to a plea bargain. The deputy county attorney had agreed that he would not offer any

evidence in aggravation if Escamilla would plead guilty to first degree murder. However, at that point, Escamilla's counsel were concerned that the judge of the district court to whom the case was assigned would impose a death sentence even if the county attorney did not offer evidence in aggravation. Counsel also discussed with Escamilla the possibility of a plea bargain involving second degree murder with other charges. Escamilla told his counsel that he was unwilling to plead guilty to second degree murder plus sexual assault or robbery because he "absolutely did not sexually assault" and "absolutely did not rob" the victim.

In June 1987, counsel recommended that Escamilla accept the county attorney's offer regarding first degree murder and informed Escamilla that they needed to act quickly. Because of certain circumstances, including the temporary disability of the district court judge to whom the case had been assigned, counsel hoped that by pleading guilty at that time, Escamilla would be able to plead in front of a different judge whom they believed would be less likely to impose the death penalty.

On June 24, 1987, Escamilla pled guilty to first degree murder before Judge Jeffre Cheuvront. In exchange for the guilty plea, the State agreed to the following: (1) The defendant would be charged under the single theory of premeditated murder, (2) no evidence of aggravating circumstances would be offered at the penalty phase of the case, (3) the State would not argue for the death penalty, (4) count II of the information (use of weapon) would be dismissed, (5) no other charges arising from this incident would be filed, and (6) copies of all police reports would be furnished to the defendant. The court interrogated Escamilla to determine that the plea was being made knowingly, intelligently, and voluntarily, and as Escamilla said, "I was aware that I was stabbing him, and I was aware I could have stopped." A factual basis for the plea was given, including the results of the autopsy, which disclosed that the victim had been stabbed a total of nine times. The court accepted the plea, and on August 3, Judge Cheuvront sentenced Escamilla to life imprisonment.

In his petition for postconviction relief, Escamilla alleged that he had received ineffective assistance of counsel in the

following respects: (1) Counsel failed to investigate the records and allegations of the victim's past criminal behavior and failed to adequately inform Escamilla of those allegations; (2) Escamilla's confession was obtained in violation of his constitutional right against self-incrimination and was obtained by promises, threats, and coercion by the police officer who interrogated him, and counsel failed to move to suppress the confession; and (3) Escamilla was identified by a witness under circumstances which were unduly suggestive and violated his constitutional rights, and counsel failed to move to suppress the tainted identification.

## EVIDENCE OF THE VICTIM'S CHARACTER

At the hearing on the motion for postconviction relief, counsel testified that in preparing for trial, their theory of the case was that the victim was attempting to sexually assault Escamilla and that Escamilla had stabbed the victim in self-defense. Lead counsel testified that they were looking into the victim's history of molesting children. A law clerk was assigned to interview witnesses, and she spoke with the principal of Hartley Elementary School and to a number of children who had some knowledge of the victim. Counsel learned that there had been complaints about the victim over the years and that children at the school had been told to avoid his house. Some of the children stated that the victim attempted to entice children into his home. This was consistent with counsel's inspection of the crime scene, where they found that the victim had a number of toys. Counsel stated that they had received phone calls from several different people who volunteered information in regard to the victim. One of the callers told them that the victim gave candy and his name and address to children who rode the "Glad Tidings" bus and that he "was barred" from the bus. The caller gave counsel the name of a nun at Sacred Heart School who told children not to go near the man's house. She also gave them the name of a pastor, the Glad Tidings busdriver, teachers, and others who evidently had knowledge of the victim's past behavior. Another caller told them that the victim was "an old man who was always luring children into his house and once he got them in his house, he

tried to fool around with them." Counsel testified that his file did not indicate that any further investigation was undertaken because of these calls.

On August 14, 1986, Escamilla reported to his counsel that he heard that the victim had a homosexual lover who had been at the victim's residence the morning of the killing. Lead counsel testified that he did not recall doing any followup on that report. In March 1987, Escamilla also told his counsel that he had received information that the victim's son was in the regional center and that the son had been the victim of a sexual assault by his father. Counsel stated that it was likely he had not pursued that allegation.

Counsel had also received a police report from the county attorney's office which dealt with the victim's inviting young girls into his home and lying on the bed with them. Lead counsel testified that he had hoped to find that the victim had criminal convictions. He stated:

> There weren't any of those. I mentioned the one incident. It was like we had these leads but they weren't taking us as far as to the point where I thought there was anything we could use as similar acts-type of evidence with respect to the victim. I mean, I thought that his behavior was somewhat consistent with our defense but we were struggling with how to get it into evidence.

When lead counsel was asked if he had failed to inform his client about this area of investigation, he responded: "I'm trying to recall specifically. I guess specifically I can't recall any conversations that we had about it. I was thinking that we had talked about it but I can't specifically recall that we had."

In *State v. Domingus*, 234 Neb. 267, 450 N.W.2d 668 (1990), this court held that in order to secure postconviction relief on the basis of ineffective counsel, a defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defense. See *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

A plea of guilty will be found to be freely and voluntarily entered upon the advice of counsel if that advice is within the range of competence demanded of attorneys in criminal cases.

*State v. Domingus, supra.*

In any effectiveness of counsel case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *State v. Williams*, 234 Neb. 890, 453 N.W.2d 399 (1990); *State v. Domingus, supra.*

In order to satisfy the prejudice requirement in the context of a plea, the defendant must show that there is a reasonable probability that, but for counsel's errors, the defendant would not have pled and would have insisted upon going to trial. *Id.*

The issue as to the failure to investigate the allegations of homosexuality on the part of the victim as argued by Escamilla is two-pronged in nature. On the one hand is the argument that such evidence would have supported Escamilla's claim of self-defense. The other argument, and the one on which the trial court seemed more solidly to rely, was that evidence of the victim's aggressive sexual advances toward young people would have been highly relevant to Escamilla's state of mind, and "while not providing a defense absolving him of all criminal culpability, such evidence certainly could have persuaded a jury to convict him of a lesser degree of murder."

We must then address the probable admissibility of this type of evidence. We have confronted this issue only obliquely in *State v. Lowe*, 244 Neb. 173, 505 N.W.2d 662 (1993). In that case, the defendant claimed that the murder victim had assaulted him while he, the defendant, was asleep and that in self-defense, the defendant had struck the man with a large flashlight. Although we stated that "[e]vidence of a murder victim's homosexuality may be admissible as corroborative of a defendant's claim of self-defense from a homosexual assault, provided such evidence as tendered is probative of that defense," *id.* at 183, 505 N.W.2d at 669, we found that the evidence tendered fell far short of being probative of that issue.

The court in *Williamson v. State*, 692 P.2d 965 (Alaska App. 1984), held that testimony of a proffered witness who would testify as to a homosexual experience he had with the victim should have been admitted, as it would tend to corroborate the defendant's claim that he, the defendant, was acting in self-defense.

In the case at bar, the only evidence of the assault resulting in the victim's death came from Escamilla himself in his statement to the police officer (Escamilla did not testify during the postconviction proceedings in the district court). In his description of the events which resulted in the victim's death, there was nothing that suggested Escamilla was trying to ward off an aggressive homosexual assault. Without any evidence of self-defense coming from Escamilla or someone or something in his behalf, the fact, if such be the case, of the victim's homosexuality would not be material and therefore not be relevant. Relevant evidence means evidence having any tendency to make the existence of any fact that is *of consequence to the determination of the action more probable or less probable* than it would be without the evidence. *State v. Lowe, supra.* Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. *Id.* A victim's homosexuality, without some evidence that the defendant was resisting a homosexual assault, is not material and therefore not relevant.

In *State v. Escamilla*, 195 Neb. 558, 239 N.W.2d 270 (1976), this court held that although in a homicide case a defendant may show the dangerous and turbulent character of the victim, this may be done only after laying a foundation by evidence tending to show self-defense. See, *State v. Jacoby*, 260 N.W.2d 828 (Iowa 1977); *Dupree v. State*, 615 So. 2d 713 (Fla. App. 1993). No such evidence appears in the record.

Would such evidence have been admissible on the issue of the absence of premeditation on Escamilla's part so as possibly to persuade the "jury to convict him of a lesser degree of murder," as found by the trial court in its order? Neb. Rev. Stat. § 27-404 (Reissue 1989) provides:

> (1) Evidence of a person's character or a trait of his or her character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion, except:
>
> . . . .
>
> (b) Evidence of a pertinent trait of character of the victim of the crime offered by an accused or by the prosecution to rebut the same, or evidence of a character

trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor. . . .

. . . .

(2) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Several cases are cited in *State v. Lowe, supra,* of which some support and some oppose the introduction of evidence of a victim's homosexuality in corroboration of a defendant's claim of self-defense. It could be supposed that one should be permitted to advance the same theory in support of the presence or absence of premeditation.

Escamilla cites us to *Kagebein v. State,* 254 Ark. 904, 496 S.W.2d 435 (1973) (Fogleman, J., dissenting). In that case, the defendant, Kagebein, was charged with first degree murder. He attempted to call witnesses to testify as to prior homosexual acts by the victim, which attempts were rebuffed by the trial court. The defense which Kagebein tried to establish is revealed by the following statements from the court's opinion:

The appellant's defense, even though he was being tried as an accessory before-the-fact to a charge of first degree murder, was that the death of Wampler came about not as a part of a pre-arranged plan to rob and kill him, as argued by the State, but out of resistance to his homosexual advances. Appellant does not argue that the evidence of homosexuality justifies homicide but does insist that he should have been permitted to introduce evidence tending to corroborate the claim that homosexual activities preceded the killing. He urges this was important at least to the jury's consideration of the degree of homicide committed.

*Id.* at 909, 496 S.W.2d at 439.

The judgment of conviction in *Kagebein* was reversed, and the cause remanded for a new trial specifically because of a violation of the defendant's right to remain silent; however, the

court considered the claimed error as to evidence of homosexuality because, in the words of the opinion, "[s]ome of the appellant's other points for reversal should be mentioned, for they may arise upon a retrial." *Id.* The Arkansas court then went on to address the question before us, and it cites with favor the following from *Evans v. United States*, 277 F.2d 354 (D.C. Cir. 1960):

> " 'We think that, in the circumstances of this case, almost any evidence showing what kind of man the decedent was would be highly relevant in helping the jury to determine whether appellant's story of a sexual assault was truthful, and would therefore serve the interests of justice. . . .
>
> " 'Finally, but equally important, even if it convincingly appeared that the excluded testimony could not induce the jury to acquit, evidence suggesting that [the victim] was the aggressor might well have induced the jury to convict appellant for the lesser included offense of manslaughter, instead of second-degree murder.' "

*Kagebein v. State*, 254 Ark. at 910-11, 496 S.W.2d at 440.

In a separate opinion in *Parisie v. Greer*, 705 F.2d 882, 893 (7th Cir. 1983) (en banc), *cert. denied* 464 U.S. 950, 104 S. Ct. 366, 78 L. Ed. 2d 326, Judge Richard Posner wrote:

> Parisie wants the evidence [testimony of three witnesses] admitted in order to bolster his defense of "homosexual panic," which is the idea that a latent homosexual—and manifest "homophobe"—can be so upset by a homosexual's advances to him that he becomes temporarily insane, in which state he may kill the homosexual. It is no business of mine whether the State of Illinois chooses to recognize a defense of "homosexual panic" as a subcategory of the insanity defense, but I cannot believe that the Constitution of the United States requires a state to allow defense counsel in a murder case to defame the murderer's victim as a homosexual without satisfying the normal prerequisite to admitting evidence of reputation—that the evidence " 'be based upon *contact with the subject's neighbors and associates rather than upon the personal opinion of the witness*.' "

(Emphasis supplied.) See *State v. Lowe*, 244 Neb. 173, 505 N.W.2d 662 (1993). Nebraska does not specifically allow the defense of "homosexual panic," and there is no evidence in the record to support a finding that such a diagnosis was or could be made.

Expressing a view of some judges comprising the minority of the *Parisie* en banc court, Judge Luther Swygert wrote:

> There is no consensus even in the medical and psychiatric communities whether homosexuality is a character trait (which would generally be provable under Illinois law only by evidence of reputation . . .) or a medical condition (which would surely be directly provable by evidence of symptoms). In either case, however, evidence of Jackson's homosexuality would be relevant under the Illinois standard of relevancy . . . (relevant evidence is that "which tend[s] to make the proposition at issue more or less probable") . . . because his homosexuality made it likelier that he made a homosexual advance toward Parisie.

*Parisie v. Greer*, 705 F.2d at 900-01. Again, Judge Swygert seems to be addressing a claim of self-defense.

In *Evans v. United States*, 277 F.2d 354 (D.C. Cir. 1960), the appellant's conviction of second degree murder was reversed because the trial court refused the proffer of testimony by the deceased's wife that the deceased was mentally ill and that when he was drinking, he would become psychotic and would act in a belligerent manner. This evidence was intended to bolster the appellant's claim that she was assaulted by the victim, who shouted obscenities at her, grabbed her, and ripped some of her clothing. In addition to holding that the rejection of the proffered evidence was prejudicial error, the court went on to say:

> Finally, but equally important, even if it convincingly appeared that the excluded testimony could not induce the jury to acquit, evidence suggesting that he was the aggressor might well have induced the jury to convict appellant for the lesser included offense of manslaughter, instead of second-degree murder.

*Id.* at 356.

In the dissenting opinion, Judge Charles Fahy stated:

> The defense offered was the need to kill deceased in resisting a sexual assault. In my view the proffered testimony was too tenuous in corroborative relationship to this particular defense to justify reversal because of rejection of the proffer, especially when all the evidence as to the manner in which the homicide occurred is considered. It follows from this view that I attach no significance to the circumstance that the jury could convict of manslaughter.

*Id.*

Based on the foregoing authorities and logic, we hold that where a defendant claims that the act of killing a victim was the result of a violent and overriding reaction to a homosexual approach by the victim, evidence of the victim's prior *similar* homosexual activities may be admissible under certain circumstances as corroborative of the defendant's claim that there was a lack of deliberation or premeditated malice on his or her part necessary to convict of first degree murder.

In this case, with two exceptions, the only evidence suggested to exist is that the victim was a pedophile. We fail to see any relevancy between pedophilic behavior and Escamilla's claim that he received a homosexual proposal. There was no scientific testimony offered by Escamilla which supported his claim of "homosexual panic."

In an unsuccessful first attempt at postconviction relief pro se, Escamilla appeared before the trial court on September 21, 1990, and during a colloquy with the court in answering a question by the court, Escamilla said:

> [T]o me, I told him [the legal aid assistant] if the lawyer was insufficient in not relating to me that the deceased had a record for pedophilic behavior which if I would have known, I wouldn't have pled guilty, and I told him that, and I stayed on that, and he didn't write that down.

However, there is no sworn testimony in the record to this effect, by Escamilla or anyone on his behalf, and his petition for postconviction relief makes no allegation that had he known of the victim's background, he would not have pled guilty, thereby making his plea neither voluntary nor informed.

It is true that when a defendant pleads guilty on advice of counsel, the defendant's attorney has the duty to advise the defendant of the available options and possible consequences. *Hawkman v. Parratt*, 661 F.2d 1161 (8th Cir. 1981); *People v. Riley*, 187 Colo. 262, 529 P.2d 1312 (1975); *People v Russell*, 47 Mich. App. 320, 209 N.W.2d 476 (1973).

We consider the admitted knowledge of Escamilla of the alleged character of the victim and the information along that line possessed by his counsel, but also recognize that counsel were primarily concerned with avoiding the death penalty for their client, which was a real possibility considering Escamilla's confession and the brutal facts of this killing. Under the facts of the case, there is no reasonable probability that a jury would not have returned a verdict of guilty of first degree murder. Counsel's decision to proceed with dispatch to pursue the result they sought cannot be said to have been unreasonable, applying the heavy measure of deference to counsel's judgment. See *State v. Domingus*, 234 Neb. 267, 450 N.W.2d 668 (1990). We hold that the findings of the district court in this regard were clearly erroneous.

However, Escamilla has raised two other issues. He first claims that the trial court failed to find that counsel's neglect to file a motion to suppress his statement given to the police was erroneous so as to support a claim of ineffective assistance of counsel. He also claims that the in-court identification of Escamilla was unduly suggestive and that his counsel were deficient in convincing him to plead guilty without attempting to suppress the suggestive identification.

### CIRCUMSTANCES OF ESCAMILLA'S CONFESSION

As we have previously stated, after arriving at police headquarters, Escamilla was taken to an interview room by Officer Standley. Standley testified that he had a conversation with Escamilla and that it was not questioning or interrogating. Standley stated that Escamilla was not in custody and that Escamilla indicated that he understood he was there voluntarily, although Standley did not recall ever telling him that he was free to go.

Sergeant Domgard arrived at the interview room and began

questioning Escamilla at approximately 1:20 p.m. Domgard was aware that Escamilla had previously been convicted of stabbing a man who had sexually assaulted him as a youth. Domgard was also told that Escamilla appeared to have bloodstains on his pants.

Domgard testified that Escamilla was not afraid or nervous, but did appear to be concerned. After they spoke for some time about where Escamilla had been that morning and the evening before, Domgard told Escamilla that a neighbor of the victim's had observed someone matching Escamilla's description running away from the victim's residence that morning. He also told Escamilla that the victim was much like the person that had victimized Escamilla in Scottsbluff and suggested that Escamilla may have had a flashback and "stuck" the victim. He suggested that Escamilla was himself being victimized, and informed him that the police department had received numerous reports about the victim's possibly enticing young people into his home. Domgard told Escamilla that there was quite a bit of evidence at the victim's residence that would be able to tie him into the case if he were involved and that Escamilla should tell him the truth because later he might not have the opportunity. At that point, Escamilla admitted his involvement. Escamilla had not yet received any *Miranda* warnings. Domgard testified that Escamilla was not in custody prior to his confession, despite the fact that Escamilla had previously been involved in a similar stabbing incident, had bloodstains on his clothing, and might have been in the vicinity of the crime that morning. However, Domgard did not tell Escamilla that he was free to go.

The statement with which we are concerned is the formal taped confession which it is admitted was not taken until after Escamilla had received the *Miranda* warnings. However, it is Escamilla's position that any statement given following the unwarned statement is "fruit of the poisonous tree" and must be suppressed. Therefore, the statement would not have been available for use in any trial had Escamilla pled not guilty.

On this issue we agree with the conclusion of the trial court, which found that "the totality of the circumstances do not support a finding of undue force or coercion on the part of the

police [and that] it cannot be reasonably argued that Escamilla's subsequent confession was involuntary and thus inadmissible."

The trial court cited extensively from *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985): "Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Oregon v. Elstad*, 470 U.S. at 309.

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

*Id.* "There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question . . . ." *Oregon v. Elstad*, 470 U.S. at 312.

## CIRCUMSTANCES OF IDENTIFICATION

Finally, we determine that the record supports the conclusion of the trial court that the in-court identification of Escamilla by a witness was not unduly suggestive.

On the day of the homicide, Officer David Goehring interviewed a neighbor, Wilmer Davidson, who lived across the street from the victim. Davidson stated that he saw a man leaving the victim's residence that morning between 7 and 7:30, going northwest toward 30th Street at a "good, fast trot." He described the man as standing 5 feet 10 inches or 5 feet 11 inches tall, weighing about 160 pounds, and being clean-shaven with dark hair down over his ears. He described the man's complexion as

> kind of a real heavy tan, kind of a yellowish color, like a [sic] I can see it in my mind, kind of like a [sic] oriental. Like I said before, I kind of hate to say this, kind of like a

half-breed color, black and white or yellow and white, what I'm trying to say.
He also stated that the man was wearing blue pants, a white butcher's-type apron that covered the front of his pants, and no shirt. When Escamilla was first contacted the day of the homicide, he was wearing tan pants and a red sweatshirt around his shoulders. He weighed approximately 130 pounds and was about 5 feet 4 inches tall. Escamilla's counsel recalled that Escamilla had a beard at the time of his arrest.

Prior to the preliminary hearing, Escamilla agreed to appear in a lineup. However, no lineup took place, and no photo array was shown to Davidson. At the preliminary hearing, Escamilla sat at the defense table with his counsel. Davidson testified at the hearing that the person he saw leaving the victim's residence was a member of the Hispanic race, and identified Escamilla as that person. One of Escamilla's counsel could recall only two members of any minority race, other than his client, who were present in the courtroom during the preliminary hearing; these were two females who were seated in the audience. That same attorney agreed that it would have been difficult for Davidson to fail to identify Escamilla under those circumstances. Counsel could not recall discussing with his client the possibility of a motion to suppress.

On this point, we could do no better than to quote from the trial judge's order:

> While it is quite clear that the courtroom identification was suggestive, it is well-established that suggestiveness alone does not violate due process so long as the identification possesses sufficient aspects of reliability. *Manson v. Brathwaite*, 432 U.S. 98 (1977); *State v. Richard*, 228 Neb. 872, 424 N.W.2d 859 (1988). . . .
>
> . . . The court [in *State v. Holtan*, 205 Neb. 314, 287 N.W.2d 671 (1980)] held, however, that in order to establish ineffective assistance of counsel, it must be shown that counsel's inaction resulted in an actual prejudice to the defendant. Consequently, since the evidence was "so overwhelming that the imposition of the death penalty would be a certainty" if the defendant went to trial, the court concluded that "if competent counsel,

after investigation[,] considers a point worthless, the fact that he is court-appointed does not require him to pursue it. . . . [T]he right to counsel . . . does not include the right to . . . advance a totally frivolous claim . . . ." *Id*. at 320, 287 N.W.2d at 675.

. . . Here, even if Escamilla's counsel had pursued and succeeded in suppressing the identification as unduly suggestive, the defendant's post-*Miranda* confession would have, in all likelihood, been sufficient to prove his guilt. Consequently, as in *Holtan*, counsel's failure to suppress the identification would not have prejudiced the defendant in any material way. This allegation is without merit.

## CONCLUSION

The holdings of the trial court relating to Escamilla's statement and the in-court identification were correct and are affirmed. However, the judgment relating to the investigation issue on which the trial court granted postconviction relief is reversed, and the cause is remanded with directions to dismiss the action.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED WITH DIRECTIONS TO DISMISS.

SHANAHAN and FAHRNBRUCH, JJ., not participating.